**SOUTHWESTERN GAS & ELECTRIC CO. v. HUTCHINS.**

No. 2443.

Court of Civil Appeals of Texas. Beaumont.

Feb. 7, 1934.

Rehearing Denied Feb. 21, 1934.

Davis, Avery & Wallace, of Center, and George Prendergast, of Marshall, for appellant.

J. J. Collins, of Lufkin, and Sanders & McLeroy, of Center, for appellee.

WALKER, Chief Justice.

While appellee, G. O. Hutchins, was assisting in carrying a wire cable, attached to the top of a wooden oil derrick 135 feet high, to an anchor about 190 feet immediately south from the foot of the derrick, under the electric wires of appellant, Southwestern Gas & Electric Company, the cable was brought close enough to the electric wires to cause the electricity to jump from the wires to the cable, thereby killing one of appellee's fellow workmen and injuring him and the others, who were holding the cable at the time. On the jury's verdict convicting appellant of negligence "in maintaining the electric wires in question in an uninsulated and bare condition at the point where the accident in question occurred," and that such negligence was the proximate cause of the accident, appellee was awarded judgment for $2,990. Appellant asserts that the evidence failed to raise against it this issue of negligence. This proposition is overruled.

That the wires were not insulated was conceded. At the time appellant's electric wires were carrying 11,000 volts of electricity. Its expert witness and employee, Mr. George D. Pollock, testified: "This line contained 11,000 volts of electricity and could not be insulated. The maximum voltage that can be insulated is 600 volts. * * * This line was erected according to the most approved standards. * * * This line is 11,000 volts and cannot be insulated."

But on this issue he gave the following additional testimony:

"Q. What is the voltage that can be insulated? A. Six hundred volts.

"Q. What is over the cities? A. Twenty-three hundred, four thousand, sixty-six hundred, eleven thousand, and thirteen thousand two hundred.

"Q. Haven't you seen lines over the cities and towns of Texas that are insulated? A. Yes, I have seen quite a good deal of insulated lines strung.

"Q. Isn't it universally practiced to insulate all wires throughout cities and towns? A. I wouldn't say that because a good number of companies use bare wires throughout.

"Q. Most of them use insulated wires throughout. A. I suppose a small larger per cent use an insulated wire.

"Q. That is because it is safer? A. No, I wouldn't say it is safer.

"Q. Why do they insulate it then? A. It is beyond me—I don't know.

"Q. Haven't any idea? A. I can't imagine. It is not safer."

Appellant's wires were strung on poles 25 feet and 9 inches above the ground at the lowest point in their "sag," and had been erected according to a well-recognized scientific code. The derrick in question was in the residential section of the town of Kilgore, and was erected before appellant built its electric line. Appellant's trouble shooter, Mr. Orville Womack, testified:

"Q. You have seen these derricks collapsed many times in the oil field? A. Yes sir.

"Q. You haven't been around in the oil fields and noticed them tearing down derricks? A. Yes, I seen them pulled down, but never saw them take the top out.

"Q. Never saw one taken down in that manner? A. No sir.

"Q. Don't you know it is the universal custom among workmen in the oil field to pull the derrick down in that manner? A. No sir.

"Q. That is the first time you ever heard of it being done in that way? A. Yes sir.

"Q. And you been around the oil field how long? A. I went down there on March fourth, right after the field came in.

"Q. You do know that derricks were built all throughout the oil field there in close proximity to your high power line, didn't you? A. Yes sir.

"Q. And particularly at the point where this accident occurred didn't you? A. Yes sir.

"Q. And knew the land to both sides was leased to people to drill for oil? A. No sir.

"Q. You knew oil operations were going on? A. I knew that, but do not know about the leases.

"Q. You knew men were going in and out of the field there from day to day in the pursuing of their work? A. Yes sir.

"Q. And you knew your line crossed Commerce Street there? A. Yes sir.

"Q. And knew they were uninsulated and carrying a high voltage of electricity? A. Yes sir.

"Q. And all the service you were giving down there was to one pump station, and one house, after you left your main line? A. Two motors.

"Q. And you knew they only require four hundred and forty volts of electricity to operate them? A. Yes sir."

The derrick was on the Knoles tract of land, upon which the Oriental Oil Company had an oil and gas lease. The oil company erected its derrick 154 feet from the dividing line between the Knoles tract of land and the Lewis Alexander tract of land immediately south, and Hutchins Bros. were at the time dismantling the derrick under contract with this oil company, doing this in the usual and customary manner used at the time in the Kilgore oil field, by cutting the uprights of the derrick about 30 feet from the top and then pulling the top out of the derrick in the manner stated. The Lewis Alexander tract was under an oil lease to Degner Oil Company. Hutchins Bros. had general permission from Degner Oil Company to enter upon any and all of its leases in the Kilgore oil field whenever necessary in the due prosecution of their work but no special permission to enter the Lewis Alexander tract on the morning of the accident. The Lewis Alexander tract of land was located not far from the business section of the town of Kilgore, and the public generally used it as a public place, whenever a member of the public had business in the oil field that required its use going in and out, over and across, this land, just as the business district of the town was used, paying no attention to the dividing lines between this tract and adjacent property. All this was done with the consent and acquiescence of Lewis Alexander and his lessee and the other adjacent property owners. Appellant did not maintain any warning sign or notice that

its wires were electric wires, highly charged with electricity. Neither appellee nor any of his fellow workmen knew the character of these wires nor that they were charged with electricity. Though erected according to a recognized scientific code, there was testimony to the effect that appellant had installed its wires nearer the ground than was usual in cities, and there was testimony to the effect that some of its electric wires in other sections of the town of Kilgore were insulated. The derrick was in the residential section of the town of Kilgore. Appellee and his associates, immediately prior to the time he was shocked, had carried the cable to an anchor imbedded in the ground on the Lewis Alexander tract, immediately south of the derrick, and about 35 feet from the line of the Knoles tract. They were attempting to fasten the end of the cable to this anchor; the method being then for the workmen to pull on the cable, thereby pulling the top out of the derrick. The cable did not come in actual contact with the electric wires, but in attempting to fasten it to the anchor appellee and his fellow workmen caused it to come within about a foot of the electric wires, when the electricity jumped from the wires to the cable, thereby killing one of the workmen and shocking appellee and the others. The day of the accident the weather was damp with some rain. Appellant's expert testimony was to the effect that the electricity could not jump from the wires to the cable unless the cable was within less than half an inch of the wires.

██ We think this statement of the evidence raised against appellant the issue of negligence now under discussion. That appellant could have insulated the wires in question is shown by the fact that it insulated its wires in other sections of the town of Kilgore and that other companies under similar conditions and circumstances insulated their wires. Appellant knew that derricks were dismantled by pulling them down and, knowing this fact, installed its wires in an uninsulated condition near the derrick, without giving any warning to the workmen of their character and of the danger in approaching them. Appellee and his fellow workmen were lawfully on the Knoles land and also the Lewis Alexander land in the regular discharge of the duties they owed their master. Under these facts we cannot escape the conclusion that the issue was raised against appellant that it should have anticipated that some one, in the exercise of ordinary care, might come in contact with its uninsulated and highly dangerous wires. The general rule is that, when the owner erects and maintains high-tension electric wires at places where workmen are liable to come in contact with them, he is bound to exercise ordinary care not to injure them (14 A. L. R. 1024; 56 A. L. R. 1021); and generally he is liable for failing to exercise ordinary care to prevent injuring one having a legal right upon the premises where its wires are maintained, such as workmen, invitees, etc. (16 Tex. Jur. 255, 256). In Oil Belt Power Co. v. Touchstone (Tex. Civ. App.) 266 S. W. 432, 439, the injured person was given permission by the occupant of the premises to go upon a water tank situated thereon and look for cattle belonging to his mother. While upon the water tank he went in swimming in the tank and was electrocuted by coming in contact with electric wires owned by the defendant company and maintained about 7 feet above the top of the tank in an uninsulated condition. In sustaining the issue of negligence against the defendant, the court said:

"It cannot be doubted that it is negligence to maintain an uninsulated wire highly charged with electricity, and without any warning of danger, in any place where persons may reasonably be expected to come in contact therewith. And we are of opinion that the pivotal and controlling question in this case is whether or not the evidence was sufficient to warrant a finding by the jury that the appellant should reasonably have anticipated that some person might probably go upon the running board of a water tank under circumstances similar to those upon which Webbie Touchstone went thereon, and while there might probably sustain injury from the electric current passing through its uninsulated wires, the danger from such wires being a hidden danger, and no warnings against the same having been posted. * * * If appellant could reasonably have anticipated some injury to some person situated as was the deceased, who might be expected to probably go upon the tank under like circumstances, then it owed the duty to exercise ordinary care to avoid such injury. * * * We are of the opinion further that those employees should reasonably have anticipated that persons rightfully upon the lease might probably walk thereon."

██ But appellant says appellee, as a matter of law, was not in the exercise of ordinary care. This contention is also denied. He

did not know that the overhead wires were charged with electricity nor that they were used for transporting electric current nor that danger would result to him from his cable coming in close proximity to them. He and his fellow workmen knew that the wires were strung overhead and tried to keep away from them and, in fact, did not come in actual contact with them. According to his testimony, the cable did not come closer to the electric wires than one foot. Appellant's testimony was to the effect that the electricity could not jump from the wires to the cable over a distance as much as half an inch. The testimony raised the issue that appellee and his associates were careful in trying to stretch the cable so as not to injure appellant's electric wires. Under these facts the issue of contributory negligence was a question for the jury. G.-H. Electric Co. v. Reinle (Tex. Civ. App.) 264 S. W. 783, 789.

■ Appellant's principal criticisms of this finding of the jury are based upon its construction of the testimony. Thus it contends that its wires were strung over the Lewis Alexander land and not over the Knoles land, and that appellee and his fellow workmen were trespassers on the Lewis Alexander land. It offered testimony to the effect that its wires were over the Lewis Alexander land with permission of Lewis Alexander. The argument is that, since appellee was a trespasser, appellant owed it no duty, and therefore it was not guilty of negligence in failing to have its wires insulated. We have given most careful consideration to appellant's theory of the evidence. One of appellee's witnesses, and also one of appellant's witnesses, placed the electric wires on the Knoles land. Appellant did not ask that this issue be submitted to the jury; therefore it is our duty to resolve the conflict in support of the judgment.

The jury also convicted appellant of negligence in the following additional respects, attacked by appellant as being without support in the evidence: (a) It failed to keep its wires stretched "tightly from pole to pole at the point of the accident," and that as a result of such failure the wires were permitted to sag at the point where the cable which plaintiff was working on came in contact with or in close proximity to said wire, or wires, at the time of the accident. (b) It was negligence on the part of appellant to transmit over "the line in question the amount of voltage of electricity which it was carrying at the time of the accident." (c) Appellant was guilty of negligence in failing "to place some

character of warning at the place where said accident occurred which would have served to notify plaintiff of the fact that the wire, or wires, in question were electrical wires, laden with electricity." We pretermit a discussion of appellant's assignments against these findings because the finding already discussed is sufficient to support the judgment.

■ Appellant offered testimony to the effect that the anchor was on the Lewis Alexander land about 100 feet from the Knoles line. The court did not err in permitting appellee's counsel to testify as an expert mathematician that, if the wire cable was stretched from the top of the derrick to the anchor, as appellant located it, the cable immediately under the electric wires would be 65 feet above the ground. This witness was also permitted to testify the distance the cable would be above the ground immediately under the wires if attached to an anchor 35 feet from the Knoles line, and also "due to the length and height of the cable" it would not be possible to stretch it taut as it extended from the top of the derrick to the anchor. We agree with appellee that appellant's assignments of error do not support this proposition, but, if they do, there was no error in receiving the evidence.

·■■ The following argument by Mr. McElroy, attorney for appellee, was not error: "I will ask you gentlemen of the jury to give this boy the same fair consideration that you would give to your own boy." This argument was duly excepted to by appellant at the time it was made, the exception sustained by the trial court, and the jury instructed not to consider it, whereupon counsel withdrew the argument. If error, the rulings of the court rendered it harmless.

■ Appellee pleaded for only $2,990 in damages. The jury assessed his damages at $2,999. In entering judgment for the amount claimed in the petition, that is, $2,990, the court did not commit error. Texas-Mexican Ry. Co. v. Sutherland (Tex. Civ. App.) 189 S. W. 983.

The verdict as to the amount of damages awarded appellee so clearly has support that no useful purpose could be served by reviewing the evidence on this issue.

It follows that the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.

COMBS, Justice (dissenting).

I do not think the evidence raises any issue that appellee's injuries were the proxi-

mate result of the alleged negligence of appellant, in that the accident was not such as could reasonably have been foreseen and anticipated by the appellant, by the exercise of ordinary care.